J-S53031-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: Q.B.P., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.C., MOTHER | No. 345 MDA 2016 |

Appeal from the Decree February 4, 2016
in the Court of Common Pleas of Berks County Orphans' Court
at No(s):82805

BEFORE: BOWES, SHOGAN, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:                    **FILED AUGUST 10, 2016**

J.C. ("Mother") appeals from the decree[1] dated and entered on February 4, 2016, granting the petition filed by the Berks County Children and Youth Services ("BCCYS") to involuntarily terminate her parental rights to her dependent, special needs child, Q.B.P., a male born in May of 2003 ("Child"), pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).[2]  We affirm.

---

[*] Former Justice specially assigned to the Superior Court.

[1] On November 16, 2015, this Court, acting *sua sponte*, dismissed Father's appeal at Docket No. 1117 WDA 2015 as duplicative, and preserved the right for him to assert issues properly raised at that docket number in the present appeal.

[2] In a separate decree dated and entered on February 4, 2016, the trial court involuntarily terminated the parental rights of E.B.P., a/k/a E.P., the putative father of Child, ("Father").  Father has not filed an appeal from the termination of his parental rights.  Father also is not a party to this appeal and has not filed a brief in this appeal.

We adopt the trial court's history of this case in its opinion. *See* Trial Ct. Op., 3/28/16, at 5-11. On September 27, 2012, BCCYS filed the petition for the termination of Mother's parental rights to Child, who has been in the care of BCCYS since May of 2011.[3] The trial court held a hearing on the petition on February 1, 2016.[4] At the hearing, BCCYS presented the testimony of Ruth George, the adoption caseworker working with Child. N.T., 2/1/16, at 7. Mother also presented the testimony of Jennifer Steigerwald, the BCCYS caseworker assigned to Mother's two older children, Z.C. and Z.C. *Id.* at 60. Mother testified on her own behalf, and presented the testimony of E.M., who is involved in assisting Mother with peer-family-support therapy. *Id.* at 63-64. On February 4, 2016, the trial court entered the decree granting the involuntarily termination petition pursuant to Section 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act. On February 23, 2016, Mother timely filed a notice of appeal along with a

---

[3] Mother asserts that the trial court succinctly and accurately set forth the history of this case, but that the trial court erred in the date it provided for the filing of the petition for involuntary termination of parental rights. She alleges that BCCYS filed the termination petition on September 27, 2012. Mother's Brief at 7. The certified record contains the petition filed on that date, as indicated by the docket. The trial court stated that the BCCYS filed the petition on September 27, 2012. Trial Ct. Op. at 5. Thus, we do not discern any such error.

[4] The trial court explains the reason for the delay in holding the hearing in its opinion, which set forth the history of the dependency permanency reviews.

concise statement of errors complained of on appeal pursuant to Pa.R.A.P.

1925(a)(2)(i) and (b).

In her brief on appeal, Mother raises six questions for this Court's

review, as follows:

> 1. Did the Honorable Court err by terminating [Mother's] parental rights?
>
> 2. Was the evidence presented by Petitioners insufficient to support the Honorable Court's decision to terminate [Mother's] parental rights?
>
> 3. The Honorable Court erred in and abused its discretion by not properly considering that [Mother] prior to the filing of the Petition to Terminate her parental rights had: initiated and complied with all required services, had overcome addiction to alcohol, sought and obtained spiritual guidance and became involved with her church community including assisting with child religious education, completely turned her life around achieving stability, maintained steady employment and appropriate housing[,] had remediated the circumstances which served as the basis for removal of the child; all of the aforesaid having been initiated prior to the filing of the Petition to Terminate her parental rights: That [Mother] had: [sic] the conditions that led to the child's removal or placement no longer exist; [Mother] has remedied the conditions which led to removal or placement within a reasonable period of time;
>
> 4. The Court failed to properly consider and did abuse its discretion by not considering that almost two years passed between the filing of the Petition to Terminate and the holding of the hearing.
>
> 5. The Court failed to properly consider and did abuse its discretion by not determining that the appellee['s] argument[s] that all post-petition efforts are irrelevant, even though it waited almost two years before scheduling the hearing on its Petition [to] Terminate the parental

- 3 -

rights of [Mother] to the detriment of [Mother], are without merit.

6. The Court failed to properly consider and did abuse its discretion by not considering that the inequity that exists in the provision of service and lack of peer professionals when it comes to [BCCYS] to African American and Latino families, as staff, caseworkers, supervisors, managers, guardian ad litems, master hearing officers, therapeutic services providers, et al[.], do not racially, nor culturally represent the families, including that of [Mother], that are being negatively impacted in the services provided by BCCYS which creates a disparate impact on the outcomes of stabilizing, problem solving, and reuniting families of color in Berks County.. [sic]

Mother's Brief, at 6-7.

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As we discussed in [*In re R.J.T.*, 9 A.3d 1179 (Pa. 2010)], there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other

- 4 -

hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (most citations omitted).

The burden is upon the petitioner "to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

The standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Id.* (quotation marks and citation omitted).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of Section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). The trial court terminated Mother's parental rights under Section 2511(a)(1), (2), (5), (8), and (b). We focus on Section 2511(a)(2) and (b), which provides as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

This Court has explained that the focus in terminating parental rights under Section 2511(a) is on the parent, but under Section 2511(b), the focus is on the child. *In re C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). Mother's first two issues challenge the sufficiency of the evidence to support the trial court's termination of her parental rights without specifying any subsection of Section 2511. Mother's third, fourth, fifth, and sixth issues challenge the sufficiency of the evidence to support the termination of her parental rights under Section 2511(a).

The Supreme Court set forth our inquiry under Section 2511(a)(2) as follows:

> [Section] 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that the repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent. . . .
>
> [The Supreme Court] has addressed incapacity sufficient for termination under § 2511(a)(2):
>
> > A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

*In re S.P.*, 47 A.3d at 827 (quotation marks, brackets, and citation omitted).

This Court has stated that a parent is "required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities." *In re A.L.D.* 797 A.2d 326, 340 (Pa. Super. 2002) (citation omitted). "[A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *Id.* (citation omitted).

We adopt the trial court's assessment of the evidence regarding Mother's repeated incapacity to parent the Child and her inability to remedy the conditions and causes of her incapacity to parent the Child over the period that he has been in care. **See** Trial Ct. Op. at 5-11. The trial court found that the repeated and continued incapacity, abuse, neglect, or refusal of Mother has caused Child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being, and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by Mother. **See id.**

To the extent that Mother complains in her sixth issue that the trial court failed to properly consider, and abused its discretion by not considering, that an inequity exists in the provision of service and lack of peer professionals when it comes to BCCYS services to African-American and Latino families, we construe her argument as a challenge to BCCYS's failure to use reasonable efforts to provide reunification services for Child and her. Our Supreme Court has held, however, that the trial court is not required to consider an agency's reasonable efforts to promote reunification in relation to a decision to terminate parental rights under Section 2511(a)(2). **In re D.C.D.**, 105 A.3d 662, 675 (Pa. 2014). Thus, we find that Mother's sixth issue lacks merit.

Although a reasonable efforts inquiry is not an element to a termination decision under Section 2511(a)(2), our review of the record

shows ample evidence that BCCYS made reasonable efforts but Mother failed to make sufficient progress with the services provided to successfully be capable of parenting Child. As the trial court's factual findings are supported by the record, and the court's legal conclusions are not the result of an error of law or an abuse of discretion, we affirm the trial court's decree with regard to Section 2511(a)(2). *In re S.P.*, 47 A.3d at 826-27.

Next, we review the termination of Mother's parental rights under Section 2511(b). Our Supreme Court recently stated as follows:

> if the grounds for termination under subsection (a) are met, a court shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability. [T]his Court held that the determination of the child's needs and welfare requires consideration of the emotional bonds between the parent and child. The utmost attention should be paid to discerning the effect on the child of permanently severing the parental bond.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (quotation marks, brackets, and citations omitted and alteration added).

We have stated that "[w]hen conducting a bonding analysis, the court is not required to use expert testimony," but may rely on the testimony of social workers and caseworkers. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citation omitted). This Court has also has observed that no bond worth preserving is formed between a child and a natural parent when the child has been in foster care for most of the child's life and the resulting

- 9 -

bond with the natural parent is attenuated. *In re K.Z.S.*, 946 A.2d 753, 764 (Pa. Super. 2008). It is appropriate to consider a child's bond with his or her foster parent. *See In re T.S.M.*, 71 A.3d at 268.

In addition, in *In re T.S.M.*, our Supreme Court set forth the process for evaluation of the existing bonds between a parent and a child, and the necessity for the court to focus on concerns of an unhealthy attachment and the availability of an adoptive home:

> [C]ontradictory considerations exist as to whether termination will benefit the needs and welfare of a child who has a strong but unhealthy bond to his biological parent, especially considering the existence or lack thereof of bonds to a pre-adoptive family. As with dependency determinations, we emphasize that the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Obviously, attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact. Similarly, while termination of parental rights generally should not be granted unless adoptive parents are waiting to take a child into a safe and loving home, termination may be necessary for the child's needs and welfare in cases where the child's parental bond is impeding the search and placement with a permanent adoptive home. . . .

> [The Adoption and Safe Families Act of 1997, P.L. 105-89,] was enacted to combat the problem of foster care drift, where children, like the children in this case, are shuttled from one foster home to another, waiting for their parents to demonstrate their ability to care for the children. This drift was the unfortunate byproduct of the system's focus on reuniting children with their biological parents, even in situations where it was clear that the parents would be unable to parent in any reasonable period of time.

> Following ASFA, Pennsylvania adopted a dual focus of reunification and adoption, with the goal of finding permanency for children in less than two years, absent compelling reasons.

*Id.* at 268-69 (citations omitted).

Instantly, we adopt the trial court's discussion of the needs and welfare of Child and its bond-effect analysis. **See** Trial Ct. Op. at 11-12. The trial court properly considered the best interests of Child in rendering its decision that given the lengthy time that Child had been in the care of BCCYS, there was no bond between Child and Mother and that Child would not suffer any permanent detrimental effect from the termination of Mother's parental rights. **See id.** at 11. The trial court had sufficient evidence from which it could properly conclude that it was in Child's best interests to terminate Mother's parental rights. **In re T.S.M.**, 71 A.3d at 268-69.

As we noted in **In re Z.P.**, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." **Id.** at 1125 (citation omitted). Rather, "a parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." **In re B., N.M.**, 856 A.2d 847, 856 (Pa. Super. 2004). As the trial court's factual findings are supported by the record, and the court's legal conclusions are not the result of an error of law or an abuse of discretion, we affirm the trial court's decision with regard

to subsection (b). ***See In re S.P.***, 47 A.3d at 826-27. Thus, we find Mother's issues remaining lack merit. Accordingly, we affirm the trial court's decree terminating Mother's parental rights.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/10/2016

IN THE INTEREST OF:            :  IN THE COURT OF COMMON PLEAS
                               :  OF BERKS COUNTY, PENNSYLVANIA
Q.B.P.                         :  ORPHANS' COURT DIVISION
                               :
                               :  FILE NO. 82804
                               :  LIEBERMAN, Sr. Judge

Jennifer L. Grimes, Esquire – Attorney for BCCYS
Cathy M. Badal, Esquire – Guardian Ad Litem
Gregory S. Ghen, Esquire – Attorney for Mother, J.C.

**MEMORANDUM OPINION, Stephen B. Lieberman S.J.,** _ ,      March 28 , 2016.

This appeal stems from the involuntary termination of the parental rights of J.C. (Mother) to

the above-referenced child.   The petitions to terminate the parental rights of Mother were filed on

the grounds set forth in 23 Pa.C.S.A. §2511(a)(1), (2), (5) and (8).  The petition to terminate the

parental rights of E.B.P (Father) were filed on the grounds set forth in §2511(a)(1) and (2).  The

factual basis for that petition is omitted herein based on Father's not filing an appeal to the

Final Decree terminating his parental rights.

Involuntary termination proceedings were held on February 1, 2016.  At that hearing,

Mother was represented by Gregory Ghen, Esquire.  At the conclusion thereof, this Court took all

of the evidence and testimony under advisement and deferred decision on the petition.  Upon

determining that the facts alleged in the Berks County Children and Youth Services' (BCCYS)

1

16

petition were established by clear and convincing evidence, the Court terminated Mother's rights to the child, Q.B.P., by Decree dated February 4, 2016. Mother filed a timely Notice of Appeal on February 23, 2016, along with her Concise Statement of Matters Complained of on Appeal. Mother alleges the following errors:

1.    The Honorable Court erred by terminating Appellants' [sic] parental rights.

2.    The evidence presented by Petitioners was insufficient to support the Honorable Court's decision to terminate Appellants' [sic] parental rights.

3.    The Honorable Court erred in and abused its discretion by not properly considering that Appellant prior to the filing of the Petition to Terminate her parental rights had: initiated and complied with all required services, had overcome addiction to alcohol, sought and obtained spiritual guidance and became involved with her church community including assisting with child religious education, completely turned her life around achieving stability, maintained steady employment and appropriate housing had remediated the circumstances which served as a basis for removal of the child; all of the aforesaid having been initiated prior to the filing of the Petition to terminate her parental rights: That Appellant had: the conditions that led to the child's removal or placement no longer exist; Appellant has remedied the conditions which led to removal or placement within a reasonable time;

4.    The Court failed to properly consider and did abuse its discretion by not considering that almost two years passed between the filing of the Petition to Terminate and the holding of the hearing..

5.    The Court failed to properly consider and did abuse its discretion by not determining that the appellee argument that all post-petition efforts are irrelevant, even though it waited almost two years before scheduling the hearing on its Petition Terminate the parental rights of appellant to the detriment of Appellant, are without merit.

6.    The Court failed to properly consider and did abuse its discretion by not considering the inequity that exists in the provision of service and lack of peer professionals when it comes to Berks County Children and Youth Services to African American and Latino families, as staff, caseworkers, supervisors, managers, guardian ad litems, master hearing officers, therapeutic service providers, et al, do not radically, nor culturally represent the families, including that of Appellant, that are being negatively impacted in the services provided by BCCYS which creates a disparate impact on the outcomes of stabilizing, problem solving, and reuniting families of color in Berks County.

## DISCUSSION

"Terminating the parental rights of the natural parent to his [or her] child carries with it a constitutional significance because of the importance of the rights involved." *T.J.B. v. E.C.*, 652 A.2d 936, 943 (Pa. Super. 1995) (citing *In re J.W.*, 578 A.2d 952, 957 (Pa. Super. 1990)). "Consequently, clear and convincing evidence is necessary to prove the statutory grounds necessary to terminate parental rights." *Id.* The Superior Court of Pennsylvania aptly set forth the standard of review in *In re T.D.*, 949 A.2d 910, 914-15 (Pa. Super. 2008) as follows:

> Our standard of review regarding orders terminating parental rights is as follows:
> "When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005). In termination cases, the burden is upon CYS to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid. *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003).
> We have previously stated:
> "The standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.' It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination." *Id.*

Requests to have a natural parent's parental rights terminated are governed by 23 Pa.C.S.A. § 2511, which provides, in pertinent part:

> **Grounds for involuntary termination**
> **(a) General rule.**-The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

3

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
***

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
***

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
***

**(b) Other considerations.**-The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

The Court applies a two-part test when determining whether parental rights should be terminated. In *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007), the Superior Court described the test as follows:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the

4

statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id.* (internal citations omitted).

BCCYS asserts in its petition, filed on September 27, 2012, the alleged facts which support the aforementioned grounds for termination: a) Mother has failed to remedy her poor mental health; b) Mother has failed to resolve substance abuse issues; c) Mother has failed to maintain stable and appropriate housing; d) Mother is an indicated perpetrator of child abuse and has failed to resolve issues regarding inappropriate physical discipline; and e) Mother continues to lack progress in services.

The Court begins by applying the first prong of the two-part test to the instant case. First, the Court notes that the child, Q.B.P. born May 24, 2003, has been in the care of BCCYS since May 26, 2011, nearly five years. Prior to the filing of the petition to terminate her parental rights, Mother failed to follow the steps and services with which she was ordered to cooperate, and the child had been in care for a period exceeding twelve (12) months.

Mother's involvement with child welfare agencies predates the family's move to Reading, Pennsylvania. The family was actively involved with the Department of Human Services (DHS) in Philadelphia, Pennsylvania where they were opened for services regarding unstable housing, lack of basic needs, mother's untreated mental health issues, children's untreated special needs and inappropriate physical discipline. Mother's youngest child, N.C., was removed from her care due to physical injuries and her parental rights were terminated; she appealed this decision, but it was

5

affirmed by the Superior Court. (Exhibit 2). Q.B.P. and his siblings, Zh.C. and Za.C., were receiving intensive services, including placement services for several months before the case was closed in 2006. Mother is indicated on four Child Protective Services reports from Philadelphia, in 1997, 1998, 1999 and 2005, for physical abuse. The family relocated to Reading, Pennsylvania in August 2010 due to Mother's legal issues and warrants in Philadelphia. (Exhibits 1 & 30). In 2013, Mother's parental rights to her youngest child were terminated.

Mother first became involved with BCCYS in January 2011, when the Agency received a report that Mother wanted her three sons placed in foster care because she could not handle it anymore and wanted something done before she hurt them. (Exhibit 5 – Dependency Petition, p. 5). BCCYS investigated this report as well as a second report received in April 2011. During these investigations and the in-home services that followed, BCCYS had numerous concerns with the household, including: (1) Mother's admitted use of marijuana and her inability to take care of Q.B.P. and his siblings; (2) Mother threatening harm to Q.B.P. with a metal baseball bat; (3) Mother's untreated bipolar disorder/mental health issues; (4) Q.B.P. was diagnosed with Major Depressive Disorder; and (5) Mother's inappropriate physical discipline and abuse of her children.

As a result of the Agency's concerns, BCCYS petitioned for and was granted emergency custody of Q.B.P. on June 27, 2011. The children had had nothing to eat since breakfast, the youngest child was filthy and all of the children had scabies. Mother refused to bring some of her children to the doctor; and she was loud and obnoxious in the emergency room. (Exhibit 3 – Order and Petition for Emergency Custody). The initial dependency hearing was held on June 29, 2011; the Juvenile Court Master determined that probable cause existed for the child to be declared dependent due to lack of proper parental care and control and mental health issues. The child was

6

declared dependent on July 15, 2011. Mother was ordered to cooperate with extensive services including, *inter alia*, parenting education, a mental health evaluation and anger management evaluation. (Exhibit 8). Subsequent to the July 15, 2011 hearing, Judge Campbell found Zh.C. was an abused child due to physical abuse by her mother and the indicated report of physical abuse status was changed to founded.

The first permanency review hearing was held on November 29, 2011. Mother was present and represented by counsel. The Court found moderate compliance and progress. Mother was ordered to participate in all recommended and court ordered services, including but not limited to: random urinalysis on a weekly basis, obtain and maintain housing and employment, parenting instruction, and mental health services. (Exhibit 11 – Order of November 30, 2011).

The second permanency review hearing was held on March 27, 2012. Mother was moderately compliant with the permanency plan but had made minimal progress toward alleviating the circumstances which necessitated placement. BCCYS was directed to engage in concurrent planning by seeking a long term placement for Q.B.P. and his siblings. Mother was to continue to participate in all recommended and court ordered services. (Exhibit 12).

At the third Permanency Review Hearing, held on September 11 and 25, 2012, there was no change in Mother's compliance and progress since the last review period, BCCYS was directed to move forward with the concurrent plan of adoption and file a petition to terminate parental rights at the appropriate time. (Exhibit 13). BCCYS filed its Petition to Terminate Parental Rights on September 27, 2012.

The fourth Permanency Review Hearing was held on February 12, 2013. Mother again made no progress during this review period. BCCYS was directed to move forward with the concurrent

7

plan of adoption and to file for termination of Mother's parental rights. (Exhibit 14).

The fifth Permanency Review Hearing was held on August 13, 2013. Again, Mother had made no progress. The Court found Q.B.P. remained a dependent child and that custody should remain with BCCYS for placement purposes with the goal of placement in another living arrangement intended to be permanent in nature and with a concurrent goal of adoption. (Exhibit 16).

The sixth Review hearing was held on March 20, 2014 and it was clear to the Court, while commending Mother's efforts, that there was minimal compliance with the permanency plan. The Court was not convinced that Mother had acquired and internalized the skills and awareness necessary to move any closer to reunification. Everyone was aware of the severity of the damage done to Q.B.P. in Mother's household. Mother's original serious problems had not been alleviated. Q.B.P.'s therapist, believed by the Court to be African-American, was to investigate both Mother's visitation and siblings' visitation with him and provide a recommendation to the Court. (Exhibit 19 – Permanency Review Order).

The seventh Review hearing took place on September 16, 2014. The Court found that compliance and progress were no longer applicable to Mother. Visits with Mother were to remain suspended unless authorized by the guardian *ad litem*. Visitation with his sibling was found to be contrary to the safety and well-being of Q.B.P. because of allegations of sexual abuse between the siblings. (Exhibit 21). On September 12, 2014, Q.B.P. was admitted to Kidspeace Psychiatric Hospital and was diagnosed as having Major Depressive Disorder, Recurrent, Severe with Psychotic Features, Intermittent Explosive Disorder and Impulse Control Disorder NOS. His psychiatrist, Dr. Andrew Clark, recommended a change in the child's medication, but Mother refused to give consent

8

for it. BCCYS had to file an emergency motion and, after hearing, the Honorable MaryAnn Ullman authorized BCCYS to sign for the administration of the recommended medication and dosages. (Exhibits 22 & 23).

The eighth Review hearing took place on February 26, 2015. It was ordered that Mother's visits with Q.B.P. remain suspended pending further order of court. Q.B.P. was returned to the foster home of D.P., an African American, after his discharge from the hospital; he continued to engage in aggressive behavior. Therapeutic foster care was recommended but denied by insurance. Wrap around services were provided to Q.B.P., but he refused to talk. (Exhibit 25).

After the ninth Review hearing, BCCYS was directed to move forward with the concurrent plan of adoption. At this point, Q.B.P. was in placement for 15 of the last 22 months. No visitation was permitted and there was to be no discussion with the child about contact with Mother; he was to be reassured that reunification was neither planned nor foreseeable. BCCYS was directed to seek a current therapeutic recommendation from Dr. Larry Rotenberg. Mother attended the forensic evaluation with Dr. Rotenberg but objected to its release. In his report of June 18, 2015, Dr. Rotenberg opined that Mother remains "angry, sullen, suspicious, oppositional, paranoid and litigious; he views her [religious] conversion "as a superficial veneer of virtue, but underneath she remains very much the same person." He diagnosed Mother with unspecified personality disorder with many narcissistic and antisocial features. Dr. Rotenberg also opined that he "cannot conceive of any circumstance in which [Q.B.P.] should be sent back to his mother." (Exhibit 26 & 28).

The tenth review hearing was held on December 15, 2015. BCCYS was directed to move forward with the concurrent plan of adoption. It was clear that Q.B.P. was still struggling; he received trauma counseling. Visitation was suspended by court order. Q.B.P. remained oppositional

9

and aggressive; he was adjudicated delinquent following assault of school staff (Exhibit 27).

BCCYS has given Mother more than enough time to be able to learn and internalize education to be a better parent to her child. According to the expert opinion of Dr. Rotenberg, even after all the time that has passed and the services provided, Mother remains the same. Q.B.P. has very serious issues that Mother is unable to cope with, let alone help her son to deal with the trauma in his life. Mother is unable to remedy the conditions that led to placement.* In the several months leading up to the hearing, Mother, in open court, called one of her children a derogatory name and tried to give back to the child drawings that the child made for her. She also slapped that child at a visit. Mother has not seen Q.B.P. in two years and has failed to stay abreast of his psychological and medical conditions and history. These are hardly actions and signs of a changed woman. While Mother has found a church community that is willing to support her, that fact does not, in the Court's opinion, outweigh the medical opinion of DR. Rotenberg and Mother's failure to get her act together so that she can visit with and regain custody of Child.

Mother failed to complete services in part by destroying her relationships with service providers. She cannot justify this by arguing that BCCYS failed to set her up with African-American professionals. The service providers were there for her benefit; if she failed to appropriately interact with these professionals and take advantage of whatever services were available to her, she did so to her own detriment. This Court is not going to revisit rulings from other judges regarding Mother's compliance with those services or the effectiveness of those services.

---

* Mother complains that the Court failed to consider the passage of time between the filing of the Petition to terminate her rights and the hearing thereon. If anything, passage of time should have been in Mother's favor because of affording additional opportunity for her to remedy the conditions that led to Child's placement, yet Child remained a dependent child in the custody BCCYS.

10

Based on the above as well as the entire record before this Court, the first prong of the two-part test has been satisfied. The second prong, which asks this Court to consider the developmental, physical and emotional needs and welfare of the child, will now be addressed.

After reviewing the testimony and considering the exhibits, this Court has no doubt that the termination of Mother's rights will serve the best interests of Q.B.P. As discussed above, the Court does not think that Mother is able to provide for the child's development, physical or emotional needs. Fortunately, the child is currently living in a foster home which meets those needs. Q.B.P. loves his foster parent and has made great progress since he began living with D.P. This placement allows him to be part of an African American community. Q.B.P. expressed his strong desire to Dr. Rotenberg that he wants to be adopted by D.P. (Exhibit 29). The Child has been in placement for a very long period of time, and terminating Mother's parental rights will not have any permanent or detrimental effect on the minor child. In fact, the very idea of ever returning to her causes Child trauma. Child believes Mother hates him. Dr. Rotenberg stated in his report, "Because of the multifaceted nature of this child's abuse, he has created an attachment to [D.P.], which makes any effort to wrench him away from this man and the home he has created for this child an enormous threat." Dr. Rotenberg also opined, "...what one can say is that this child has undergone a very positive and remarkable metamorphosis since living with [D.P.]" (Exhibit 29, p. 7). Therefore, the Court concludes that the second prong of the two-part test has been fulfilled.

The Court notes, as finder of fact, it is the sole determiner of credibility of witnesses. *In re Adoption of B.G.S.*, 614 A.2d 1161, 1166 (Pa. Super. 1992). This Court has listened to the testimony of Mother and has considered all of the exhibits. Although before filing a petition for termination of parental rights the Commonwealth is required to make reasonable efforts to promote reunification of

11

parent and child, the Commonwealth does not have an obligation to make such efforts indefinitely. *In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa. Super. 2003). The Commonwealth has an interest not only in family reunification but also in each child's right to a stable, safe, and healthy environment, and the two interests must both be considered. *Id.* A parent's basic constitutional "right to [the] custody and rearing of [his or her] child is converted by failure of the parent to fulfill [his or her] [parental] duty to the right of the child to have proper parenting and fulfillment of his [or her] potential in a permanent, healthy, safe environment." *In Interest of Lilley*, 719 A.2d 327, 335 (Pa. Super. 1998).

Because the Court believes that Mother's issues do not contain any merit and that the needs of Q.B.P. would be best served by the involuntary termination of Mother's parental rights, the Court respectfully suggests that Mother's appeal be **DENIED**.

BY THE COURT:

**Stephen B. Lieberman, Senior Judge**

_____ March 28, 2016 _____, Certified
Copy of Memorandum Opinion issued to
Counsel of Record and/or Unrepresented
parties be: Gregory S. Cohen, Esq.
by first class mail by Register of Wills
Interdiffice C. M. Brun, Esq. + J. L. Grimes, Esq.

12